# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| MICHAEL PASCARELLA, on behalf of himself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 2:09-cv-02549 |
| SWIFT TRANSPORTATION CO., INC., | ) ) | |
| Defendant. | ) | |

## ORDER GRANTING IN PART AND DENYING
## IN PART DEFENDANT'S MOTION TO DISMISS

Before the Court is Defendant Swift Transportation Co., Inc.'s ("Swift") Motion to Dismiss filed on July 17, 2009.[1]  (D.E. #28.)  Plaintiff Michael Pascarella ("Plaintiff") filed a response in opposition on November 4, 2009, and Swift filed a reply on November 25, 2009.  For the reasons stated below, Swift's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND[2]

Plaintiff, a resident of Burlington County, New Jersey, brings this case as a putative class action against Swift, a Nevada corporation with its principal place of business located in Phoenix, Arizona.  (Pl.'s First Am. Compl. ¶¶ 1, 8, 13.)  Plaintiff's complaint also names as defendants Sharon A. Harrington ("Commissioner Harrington"), the Chief Administrator of the New Jersey Motor Vehicle Commission, and David

---

[1] This action originated in the United States District Court for the District of New Jersey, but was transferred to the Western District of Tennessee on August 25, 2009 and then consolidated with three other related cases.

[2] The following factual recitation is taken from Plaintiff's First Amended Complaint and is assumed to be true for purposes of this motion only.

Mitchell ("Commissioner Mitchell"), the Commissioner of the Tennessee Department of Safety.  (Id. ¶¶ 15-16.)

Between May 1, 2005 and January 31, 2008, Swift operated the Swift Driving Academy ("Swift Academy") in Millington, Tennessee—which provided training to persons wishing to obtain Class A Commercial Drivers Licenses ("CDL")—and also acted as a third-party contractor for the State of Tennessee, administering official CDL tests to CDL applicants.  (Id. ¶¶ 14, 34.)  Swift charged its students tuition in the amount of $3,900 per student, which included a bus ticket to Millington, lodging in a motel owned by Swift, and associated fees.  (Id. ¶¶ 35, 37.)  Swift represented to students that they could obtain a Tennessee CDL by completing Swift's driver education course and then successfully passing the CDL test Swift administered for the State of Tennessee. (Id. ¶ 36.)  Some of Swift's students later obtained New Jersey CDLs on the basis of the Tennessee CDLs they received through Swift.  (See id. ¶¶ 45-49.)

In February 2008, federal agents raided Swift's offices in Memphis and Millington.  (Id. ¶ 51.)  The State of Tennessee, through Commissioner Mitchell, then notified licensing authorities in other states that Swift's testing procedures from May 2005 to January 2008 were flawed as a result of Swift's failure to following rules and regulations governing CDL testing.   (Id. ¶ 54.)   Plaintiff alleges that the State of Tennessee approved the ostensible irregularities in CDL testing, and that the decision to nullify Swift's test results arises solely from a political disagreement between the Tennessee Department of Safety's current and former commissioners.  (Id. ¶ 59-60.)

Following receipt of the notification sent by the State of Tennessee, the State of New Jersey issued notices to CDL-holders who had been trained and licensed through

Swift that their New Jersey CDLs would be revoked in thirty days because of unspecified improprieties by Swift.  (Id. ¶ 70.)  New Jersey's notices required drivers to take a new CDL test and to pay testing fees in order to keep their licenses.  (Id. ¶ 71.)  Plaintiff alleges that Commissioners Harrington and Mitchell failed to provide him and other similarly situated CDL-holders with adequate due process protections prior to revoking their CDLs.  (See id. ¶¶ 63-65, 85-86.)

Plaintiff filed suit in the United States District Court for the District of New Jersey on April 23, 2009, and amended his complaint on June 16, 2009.  Plaintiff sued Commissioners Harrington and Mitchell for injunctive and declaratory relief under 42 U.S.C. § 1983.  (Id. ¶¶ 125-159.)  Plaintiff's causes of action against Swift include claims for violation of the New Jersey Consumer Fraud Act and deprivation of federally protected rights under § 1983 as well as for declaratory and injunctive relief, unjust enrichment, and negligence.  (Id. ¶¶ 160-195.)  On July 14, 2009, the federal district court in New Jersey dismissed Plaintiff's claim against Commissioner Harrington, finding that "Plaintiff received sufficient notice of the intended deprivation and was not deprived of a hearing because he did not request a hearing, as provided for under New Jersey law." (Opinion of July 14, 2009 at 28.)  On July 21, 2009, Plaintiff filed a stipulation of dismissal under Rule 41(a) of the Federal Rules of Civil Procedure dismissing his claim as to Commissioner Mitchell without prejudice.  Plaintiff's claims as to Swift remain pending and are the subject of the instant motion.

**II. LEGAL STANDARD**

**A. Legal Standard for Motion under Fed. R. Civ. P. 12(b)(1)**

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure asserts that the court lacks subject matter jurisdiction.  A motion to dismiss for lack of subject matter jurisdiction may challenge the sufficiency of the complaint itself—in which case it constitutes a facial attack—or it may challenge the factual existence of subject matter jurisdiction—in which case the motion constitutes a factual attack.  United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994).  In ruling upon a facial attack, the court must take as true the allegations of the plaintiff's complaint and construe them in the light most favorable to the plaintiff, but in a factual attack, the court does not presume that the complaint's allegations are true and instead considers other evidence bearing upon the question of subject matter jurisdiction.  DLX, Inc. v. Kentucky, 381 F.3d 511, 516 (6th Cir. 2004).  When faced with a factual attack, the trial court may, at its discretion, consider affidavits and documents and even conduct a limited evidentiary hearing to resolve any disputes as to jurisdictional facts.  Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990).  The plaintiff bears the burden of proving jurisdiction on a motion to dismiss under Rule 12(b)(1).  Rogers v. Stratton Indus., Inc., 798 F.2d 913, 915 (6th Cir. 1986); see United Gov't Sec. Officers of Am. v. Akal Sec., Inc., 475 F. Supp. 2d 732, 736 (S.D. Ohio 2006).

**B. Legal Standard for Motion under Fed. R. Civ. P. 12(b)(6)**

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure only tests whether a cognizable claim has been pled.  Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988).  To determine whether a motion to

dismiss should be granted, the court examines the complaint, which must contain a short and plain statement of the claim showing that the pleader is entitled to relief. See Fed. R. Civ. P. 8(a)(2). It must also provide the defendant with fair notice of the plaintiff's claim as well as the grounds upon which it rests. Conley v. Gibson, 355 U.S. 41, 47 (1957); Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976). While the complaint need not present detailed factual allegations, to be cognizable it must provide more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not suffice. Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007); see also Scheid, 859 F.2d at 436-37.

Likewise, the complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level[.]" Twombly, 127 S. Ct. at 1965 (citation omitted). The mere possibility that some set of undisclosed facts will support recovery is insufficient to overcome a 12(b)(6) challenge. Twombly, 127 S. Ct. at 1968; see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."). On a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations made in the complaint and construes them in the light most favorable to the plaintiff. Neitzke v. Williams, 490 U.S. 319, 326-27 (1989); Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291, 295-96 (6th Cir. 2008); Windsor v. The Tennessean, 719 F.2d 155, 158 (6th Cir. 1983). The court, however, only takes as true well-pled facts, and it will not accept legal conclusions or unwarranted factual inferences. Lewis v. ACB Bus. Servs., Inc., 135 F.3d 389, 405-06 (6th Cir. 1998); see Iqbal, 129 S. Ct. at 1949.

## III. ANALYSIS

### A. New Jersey Consumer Fraud Act Claim

Swift first argues that under a proper choice-of-law analysis, Tennessee—rather than New Jersey—law should be applied to Plaintiff's claims because Tennessee is the state possessing the most significant relationship to the parties and events. Thus, reasons Swift, Plaintiff's claim under the New Jersey Consumer Fraud Act ("NJCFA") should be dismissed. Additionally, Swift argues that Plaintiff's complaint fails to state a claim for relief under the Tennessee Consumer Protection Act—the Tennessee statute comparable to the NJCFA. Furthermore, Swift contends that, even if the Court applied New Jersey law to this case, the NJCFA does not extend to the type of actions alleged in Plaintiff's complaint.

Plaintiff responds that Swift has misconstrued the allegations of his complaint. Whereas Swift focuses on Plaintiff's allegations that it contracted with students and conducted improper testing all within the State of Tennessee, Plaintiff urges the Court to construe his NJCFA claim as addressing the wrongful actions Swift allegedly took in the State of New Jersey—specifically, advertising for and recruiting students to enroll in the Swift Academy. According to Plaintiff, Swift advertised to potential students *in New Jersey*, inducing them to enroll in the Swift Academy by representing that Swift could validly conduct testing that would lead to the issuance of a CDL from state licensing officials when Swift knew or should have known that its testing procedures were not legally sufficient to lead to a valid CDL. Thus, it is Swift's allegedly false and

misleading marketing that Plaintiff argues is subject to application of New Jersey law and thereby actionable under the NJCFA.[3]

### 1. Choice-of-Law Analysis

This action originated in the U.S. District Court for the District of New Jersey and was later transferred to this Court pursuant to 28 U.S.C. § 1404.  Ordinarily, a federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits.  Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496 (1941).  "When a lawsuit is transferred from one federal court to another pursuant to 28 U.S.C. § 1404(a), however, the transferee court should apply the substantive law, including the choice-of-law rules, that the transferor court would have applied."  Charter Oak Fire Ins. Co. v. Broan Nutone, LLC, 348 F. Supp. 2d 934, 938 (W.D. Tenn. 2004) (citing Van Dusen v. Barrack, 376 U.S. 612, 632-37 (1964)).  Therefore, the Court must apply New Jersey's choice-of-law principles.

Relying upon the Restatement (Second) of Conflict of Laws, New Jersey applies a flexible "governmental interest" analysis to determine what state has a greater interest in applying its law to an issue and thus ought to have its laws applied to a particular case.  Erny v. Estate of Merola, 792 A.2d 1208, 1212-13 (N.J. 2002).  In conducting this analysis, a court must determine whether a conflict exists among the potential bodies of law that might be applied to the action.  Id. at 1216.  To assess the interest each state possesses in the application of its laws, the court considers five factors: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the

---

[3] The implication of this argument as well as Plaintiff's reliance upon Tennessee authorities in supporting the other claims in his complaint indicates Plaintiff's agreement with Swift that Tennessee law is appropriately applied to all of his other state-law claims.

states." Id. at 1217 (quoting Fu v. Fu, 733 A.2d 1133, 1140 (N.J. 1999)).  Furthermore, "the contacts . . . most germane to the governmental-interest test . . . [are]: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." Id. (citations omitted).

Because Plaintiff's response clarifies that he seeks recovery under the NJCFA only as to false and misleading marketing by Swift in the State of New Jersey, the Court need only consider what state's law properly applies to this aspect of Plaintiff's suit.[4] Assuming without deciding that there exists a conflict between Tennessee and New Jersey law, relevant considerations clearly counsel application of New Jersey law to Plaintiff's allegations of deceptive marketing.  The alleged conduct in question is misleading advertising directed to Plaintiff and other residents of New Jersey. Furthermore, Plaintiff's suit alleges that he and other residents of New Jersey were induced by that advertising to travel to Tennessee to receive certain services.  Thus, New Jersey is the situs of the material events leading to creation of the relationship between Plaintiff and Swift.  New Jersey's interest in regulating and curtailing misleading advertisements directed towards its residents is substantial, while Tennessee's interest in advertising that occurs in New Jersey is far more attenuated.  Applying another state's law would risk undermining the level of protection that the New Jersey legislature

---

[4] "New Jersey's choice of law rules incorporate doctrine of depecage whereby 'the laws of different states may apply in the same case to different issues in the case.'" In re Consolidated Parlodel Litig., 182 F.R.D. 441, 447 (D.N.J. 1998) (quoting In re B.S. Livingston & Co., Inc., 186 B.R. 841, 863 (D.N.J. 1995) (quoting Pollock v. Barrickman, 610 F. Supp. 878, 879 (D.N.J. 1985))).  Thus, it is appropriate to apply New Jersey law to certain of Plaintiff's claims and apply Tennessee law to others.  The Court finds that Tennessee law is appropriately applied to Plaintiff's other state-law claims.

intended for its consumers when enacting the NJCFA and would expose its businesses to unfair competition from out-of-state competitors who could evade the standards established by New Jersey's consumer protection laws with impunity.  Accordingly, the Court concludes that New Jersey rather than Tennessee law applies to Plaintiff's claims based on misleading advertising by Swift.

### 2. Other Aspects of Plaintiff's NJCFA Claim

#### a. Tennessee Consumer Protection Act

After arguing in its motion for application of Tennessee law, Swift then contends that its actions did not violate Tennessee's Consumer Protection Act.  As the Court has already determined that New Jersey law applies to this aspect of Plaintiff's complaint, this argument is moot.

#### b. Pleading with Specificity under Fed. R. Civ. P. 9(b)

Next, Swift asserts that Plaintiff has not pleaded fraud with the specificity required by Rule 9(b) of the Federal Rules of Civil Procedure, which states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."   While Rule 9(b) is said to impose a particularity requirement on averments of fraud or mistake, this must be understood in conjunction with the liberal pleading standard established by Rule 8(a)(2).  See Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988); see generally 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1298, at 183-262 (3d ed. 2004).  Courts are also more lenient when the alleged wrong did not occur at a discrete time and place and instead "the transactions involved are complex or cover a long period of time." In re Eli Lilly & Co., Prozac Prods. Liab. Litig., 789 F. Supp. 1448, 1456 (S.D.

Ind. 1992) (quoting 2A James William Moore et al., Moore's Federal Practice ¶ 9.03[1], at 9-29 (1991)); see United States ex rel. Johnson v. Shell Oil Co., 183 F.R.D. 204, 206-07 (E.D. Tex. 1998) ("[I]t has been widely held that where the fraud allegedly was complex and occurred over a period of time, the requirements of Rule 9(b) are less stringently applied.") (citing several cases); see also United States ex rel. Bledsoe v. Comm. Health Sys., Inc., 501 F.3d 493, 509-10 (6th Cir. 2007) (citations omitted); see, e.g., VNA Plus, Inc. v. Apria Healthcare Group, Inc., 29 F. Supp. 2d 1253, 1263 (D. Kan. 1998) (citations omitted).

Plaintiff argues that a defendant may violate the NJCFA in ways other than actual fraud, and thus Rule 9(b) is inapplicable to his NJCFA claims. The Court agrees that the NJCFA covers many forms of "unconscionable commercial practice," see N.J.S.A. 56:8-2, and instances of sharp dealing besides conduct that is "fraudulent" in the technical sense. See, e.g., Wozniaj v. Pennella, 862 A.2d 539, 546 (N.J. Super. Ct. App. Div. 2004) ("The CFA prohibits 'the act, use or employment by any person of any unconscionable commercial practice, deception [or] fraud . . .' N.J.S.A. 56:8-2. Violations of the act can occur as a result of an affirmative act, an omission to act, or a violation of an administrative regulation."); see also Cox v. Sears Roebuck & Co., 647 A.2d 454, 462 (N.J. 1994) ("Unlawful practices fall into three general categories: affirmative acts, knowing omissions, and regulation violations. . . . A practice can be unlawful even if no person was in fact misled or deceived thereby."). As such, Rule 9(b)'s particularity requirement for averments of fraud is inapplicable to Plaintiff's NJCFA claim.

Even if Plaintiff's NJCFA claim were subject to Rule 9(b), however, the Court would still find that, given the apparently limited information currently available to Plaintiff, he has sufficiently apprised Swift of his allegations since Swift is "not left guessing about the general nature of the alleged" wrongdoing. Hurd v. Monsanto Co., 908 F. Supp. 604, 614 (S.D. Ind. 1995) (citations omitted), aff'd in part, 107 F.3d 873 (7th Cir. 1997). Moreover, there is no obvious obstacle to Swift's preparation of a responsive pleading as to Plaintiff's NJCFA claims. See Michaels Bldg., 848 F.2d at 679. Thus, Swift's request to have Plaintiff's NJCFA claim dismissed or stricken is not well-taken.

### c. Effect of Contract between Plaintiff and Swift

Finally as to Plaintiff's NJCFA claim, Swift contends that the contract between Plaintiff and Swift precludes Plaintiff's claim. Specifically, Swift asserts that its contract with Plaintiff only granted Plaintiff the right to receive training—not CDL testing—and the contract expressly disclaims any guarantee that the student will be able to pass Tennessee's CDL exam or secure a license. Neither argument is availing for Swift.

Based on the allegations of Plaintiff's complaint as clarified by Plaintiff's response, the arrangement between Plaintiff and Swift for CDL testing existed separate and apart from the relationship established by the written contract between the parties. The absence of any mention of CDL testing in the contract is thus of no moment. Furthermore, Swift cannot rely upon the contractual disclaimer since Plaintiff's suit is premised on Swift's misconduct in administering testing, not on any failure to properly train Plaintiff.

**B. Claim under 42 U.S.C. § 1983**

Swift next argues that Plaintiff's claim under 42 U.S.C. § 1983 fails as a matter of law because (1) Plaintiff does not allege that Swift approved or participated in the deprivation of Plaintiff's constitutional rights; and (2) Plaintiff does not allege that Swift has a policy that directly resulted in the alleged deprivation of Plaintiff's constitutional rights.

Considering Swift's second point first, the Court disagrees that Plaintiff's failure to identify in his complaint the particular policy or custom responsible for the deprivation of his rights necessarily mandates dismissal under Rule 12.  Although Swift correctly notes that a private corporation can only be held liable under § 1983 when it has a policy or custom that caused the alleged civil rights violation, see Street v. Corrections Corp. of Am., 102 F.3d 810, 818 (6th Cir. 1996), complaints under § 1983 are not subject to any heightened pleading standards, Leatherman v. Tarrant County Narcotics Intelligence and Coordination, 507 U.S. 163, 167-68 (1993).  Instead, a plaintiff's complaint—whether it seeks relief under § 1983 or under any other legal theory—must be plausible and not merely conceivable.  See Iqbal, 129 S. Ct. at 1950-51.  Identifying the precise policy or custom may help make the complaint's allegations more plausible, but categorically viewing such a failure as dispositive in every case involving § 1983 claims risks imposing a higher standard of pleading than allowed by the Federal Rules of Civil Procedure. Cf. Woodley v. City of Memphis, 479 F. Supp. 2d 756, 765-66 (W.D. Tenn. 2006) (discussing Moreno v. Metro. Gen. Hosp., 210 F.3d 372, 2000 WL 353537, at *2 (6th Cir. 2000)).

The Court nevertheless agrees with Swift that Plaintiff has not sufficiently alleged a cause of action against Swift under § 1983.  The gravamen of Plaintiff's allegations against state authorities consists of assertions that Commissioners Harrington and Mitchell deprived CDL-holders of due process in revoking their CDLs without providing a pre-deprivation hearing and affording other protections consistent with due process.  In addressing Swift's role in that deprivation, Plaintiff alleges only that Swift acted as a third-party tester for the State of Tennessee.  It is plausible that Swift's role as a tester might under certain circumstances subject Swift to § 1983 liability as an agent acting under color of state law, but this fact alone is not sufficient to transform any and all harm Swift may inflict in the course of its business into a federal civil rights violation.  Swift's alleged misconduct in administering tests appears to be unconnected to state authorities' alleged violations of Plaintiff's due process rights—the only civil rights violations alleged in Plaintiff's complaint.  As Swift notes, Plaintiff alleges no facts that would implicate Swift in a due process violation by governmental agencies, and Plaintiffs have failed to explain how Swift's flawed testing procedures are themselves actionable under § 1983.  Plaintiff's claim against Swift under § 1983 is only made more implausible by the fact that the U.S. District Court in New Jersey dismissed Plaintiff's claims against Commissioner Harrington on the merits, after which Plaintiff voluntarily dismissed his claims (albeit without prejudice) against Commissioner Mitchell.

Plaintiff may have been harmed by Commissioner Mitchell's revocation of his CDL, and Plaintiff may have also been harmed by Swift's testing procedures.  On the face of Plaintiff's complaint, however, these are distinct wrongs, and the Court finds no

basis for holding Swift liable under § 1983.  Accordingly, Plaintiff's § 1983 claim is dismissed.

## C. Unjust Enrichment

Plaintiff also asserts a cause of action for unjust enrichment.  "The elements of an unjust enrichment claim are: 1) '[a] benefit conferred upon the defendant by the plaintiff'; 2) 'appreciation by the defendant of such benefit'; and 3) 'acceptance of such benefit under such circumstances that it would be inequitable [ ] to retain the benefit without payment of the value thereof.'"  Freeman Indus., LLC v. Eastman Chem, Co., Inc., 172 S.W.3d 512, 525 (Tenn. 2005) (quoting Paschall's, Inc. v. Dozier, 407 S.W.2d 150, 154 (1966)).  Swift argues that Plaintiff's claim for unjust enrichment should be dismissed because there exists a valid and enforceable contract between Swift and Plaintiff as to training by the Swift Academy and that agreement does not cover testing.

Plaintiff's response clarifies that he is proceeding under the theory that there existed an arrangement by which Plaintiff paid Swift for CDL testing and that testing was ultimately found to be improper.  Plaintiff concedes that his complaint mistakenly states that this testing was part of the written contract between the parties.  Plaintiff instead contends that there was a separate agreement on testing and requests leave to amend his complaint, if necessary, to make this allegation clear.  Given the clarification provided in Plaintiff's response, the Court finds that Plaintiff may properly proceed on his claim for unjust enrichment using the theory that Swift's actions in testing Plaintiff resulted in Plaintiff conferring a benefit on Swift under circumstances such that Swift's retention of that benefit would be inequitable.  Swift's request to dismiss Plaintiff's cause of action

14

for unjust enrichment is therefore denied, and Plaintiff shall have fifteen days from the date of this order to file an amended complaint clarifying his allegations.

**D. Declaratory Relief**

Swift similarly argues that Plaintiffs' claims for declaratory relief should be dismissed because Plaintiff did not allege how Swift failed to comply with its contractual obligation to provide training through the Swift Academy.  Pointing to the contract for training, Swift argues that the contract with Plaintiff did not oblige Swift to provide him CDL testing.

As discussed above, Plaintiff's response makes clear that his complaint mistakenly alleged that testing was part of the written contract between the parties. Based on the clarification provided by Plaintiff's response, the Court finds that there exists a legitimate dispute between the parties as to the nature and extent of the duties for testing under a separate arrangement or agreement.  Accordingly, Swift's argument for dismissal of Plaintiff's claim for declaratory relief is rejected, and Plaintiff shall have fifteen days from the date of this order to file an amended complaint clarifying his allegations.

**E. Negligence Claim**

      *1. Existence of a Duty to Plaintiff*

Swift also argues that Plaintiff's position that he should recover for Swift's flawed testing procedures under a theory of negligence must be dismissed because Swift owed Plaintiff no duty with respect to testing.  According to Swift, its duties to Plaintiff were limited to those described in the contract for training at the Swift Academy.  As noted

above, however, Plaintiff asserts that a separate arrangement existed as to testing. It is therefore of no consequence that testing is not mentioned in the parties' written contract.

Swift also argues that in its capacity as a third-party tester for the State of Tennessee, it owed no duty to Plaintiff, or anyone else being tested, because its duties were solely owed to the State of Tennessee. Quoting two sentences from Tennessee state regulations that require third-party testers to comply with all of the same rules and regulations governing a state examiner, Swift contends that it owed a duty only to the State of Tennessee. While the quoted regulations make clear that the State of Tennessee required Swift to adhere to certain practices, these regulations do not preclude the possibility that Swift also owed a duty to examinees, and Swift cites no authority for the proposition that it owed its examinees no duty. To the contrary, an agent who commits a tort in the course of working for a principal is generally liable to the party injured. See, e.g., Givens v. Mullikin ex rel. Estate of McElwaney, 75 S.W.3d 383, 398 n.8 (Tenn. 2002) ("[T]he agent cannot escape the consequences of an illegal and unauthorized invasion of the right of third persons merely upon the ground that it acted for its principal.") (quoting Fidelity & Deposit Co. v. Hamilton Nat'l Bank, 126 S.W.2d 359, 364 (Tenn. Ct. App. 1938)); Williams v. Pritchard, 306 S.W.2d 46, 49 (Tenn. Ct. App. 1957); cf. White v. Revco Discount Drug Ctrs., Inc., 33 S.W.3d 713, 724 (Tenn. 2000) ("It is also well settled that an agent may serve two masters simultaneously, so long as the objectives of one master are not contrary to the objectives of the other."). Swift has presented nothing to indicate that application of this general proposition of law is inapplicable to its allegedly wrongful actions in the instant case, and thus its argument

that it necessarily owed no duty to Plaintiff by virtue of its agency relationship with the State of Tennessee is rejected.

### 2. The Economic Loss Doctrine

Swift further contends that Plaintiff's negligence claim must be dismissed under the economic loss doctrine, "a judicially created principle that reflects an attempt to maintain separation between contract law and tort law by barring recovery in tort for purely economic loss," Lincoln Gen. Ins. Co. v. Detroit Diesel Corp., 293 S.W.3d 487, 488 (Tenn. 2009).[5]  According to Swift, the economic loss doctrine applies to all actions brought in tort, while Plaintiff argues that the doctrine only applies to cases involving defective products and not to cases arising from the negligent provision of services. Although the Tennessee Supreme Court has stated that "Tennessee has joined those jurisdictions which hold that product liability claims resulting in pure economic loss can be better resolved on theories other than negligence," Ritter v. Custom Chemicides, Inc., 912 S.W.2d 128, 133 (Tenn. 1995), Tennessee's highest court has never addressed whether the economic loss doctrine applies outside of the products liability context.  "If the forum state's highest court has not addressed the issue, the federal court must ascertain from all available data, including the decisional law of the state's lower courts, restatements of law, law review commentaries, and decisions from other jurisdictions on the 'majority' rule, what the state's highest court would decide if faced with the issue." Am. and Foreign Ins. Co. v. Bolt, 106 F.3d 155, 158 (6th Cir. 1997) (quoting Grantham and Mann v. Am. Safety Prods., Inc., 831 F.2d 596, 608 (6th Cir. 1987)).

---

[5] The Tennessee Supreme Court has further said that "[t]he economic loss doctrine is implicated in products liability cases when a defective product damages itself without causing personal injury or damage to other property." Lincoln Gen. Ins. Co., 239 S.W.3d at 489.

For support, Swift relies on three cases—one published, two unpublished—from the Tennessee Court of Appeals.[6]  In the sole published Tennessee case Swift cites directly addressing the issue, United Textile Workers v. Lear Siegler Seating Corp., the court held that the economic loss doctrine precluded a suit by workers seeking lost wages against a factory owner whose propane tank leaked and caused the workers to lose a day of pay when their places of employment were closed.  825 S.W.2d 83, 84 (Tenn. Ct. App. 1990).  The court stated that it was "disallow[ing] recovery for purely economic loss absent physical injury or property damage."  Id. at 86.  One judge dissented from the court's application of the economic loss doctrine, arguing that the majority was "mechanically applying" a "dated" rule.  Id. (Franks, J., dissenting).

The Tennessee Court of Appeals has since implicitly restricted the economic loss doctrine to claims involving products liability or the sale of goods, at least where the plaintiff can establish a sufficiently direct relationship between the defendant's negligent act and the plaintiff's economic loss.  Trinity Indus., Inc. v. McKinnon Bridge Co., Inc., 77 S.W.3d 159, 173-74, 182 (Tenn. Ct. App. 2001) (appearing to limit economic loss doctrine to cases involving sale of goods under the UCC) (discussing Sain v. ARA, 660 S.W.2d 499 (Tenn. Ct. App. 1983)).  Furthermore, in a subsequent unpublished opinion from the Tennessee Court of Appeals written by now Justice Koch of the Tennessee Supreme Court, the court discussed the economic loss doctrine, apparently confining its applicability to the sale of goods by stating the following:

---

[6] The two unpublished cases Swift cites are Rural Developments, LLC v. Tucker, No. M2008-00172-COA-R3-CV, 2009 WL 112541 (Tenn. Ct. App. Jan. 14, 2009) and Amsouth Erectors, LLC v. Skaggs Iron Works, Inc., No. W2002-01944-COA-R3-CV, 2003 WL 21878540 (Tenn. Ct. App. Aug. 5, 2003).  Neither of these opinions provides the court's reasoning for applying the economic loss doctrine to cases not involving the sale of goods.

> The economic loss rule is a judicially created principle that requires
> parties to live by their contracts rather than to pursue tort actions for
> purely economic losses arising out of the contract. The rule comes into
> play when the purchaser of a *product* sustains economic loss without
> personal injury or damage to property other than the *product* itself.  In that
> circumstance, the purchaser must seek a remedy in contract, not in tort.
> Thus, when a purchaser's expectations in a sale are frustrated because a
> *product* does not work properly, the purchaser's remedies are limited to
> those prescribed by the law of contract.

McLean v. Bourget's Bike Works, Inc., No. M2003-01944-COA-R3-CV, 2005 WL
2493479, at *5 (Tenn. Ct. App. Oct. 7, 2005) (internal citations omitted and emphasis
added).  Moreover, federal courts applying Tennessee law have declined to extend the
economic loss doctrine beyond cases involving the sale of goods.  See, e.g., Corso
Enters., Inc. v. Shop at Home Network, Inc., No. 3:04-0260, 2005 WL 2346986, at *6-7
& n.7 (M.D. Tenn. Sept. 26, 2005) ("Thus, governance by the UCC of the contract at
issue is a prerequisite to the application of the economic loss doctrine and resulting
preclusion of recovery in tort.").

In confronting whether the economic loss doctrine should apply to transactions
involving services, the Wisconsin Supreme Court noted that the "genesis of the economic
loss doctrine lies in products liability cases."  Ins. Co. of North Am. v. Cease Elec. Inc.,
688 N.W.2d 462, 467 (Wis. 2004).  Application of the economic loss doctrine to cases
involving defective products is not surprising, the court reasoned, because the Uniform
Commercial Code ("UCC") sets forth the full series of rights and remedies available to an
aggrieved purchaser who suffers only economic losses.  Id. at 467-68.  Since the UCC is
inapplicable to service contracts, the court held that it would not apply the economic loss
doctrine to suits seeking recovery for negligently provided services.  Id. at 470, 472.  This
rationale for limiting the economic loss doctrine echoes that expressed by the Tennessee

Supreme Court in deciding to limit a plaintiff suing for a defective product who sustained only economic losses to remedies under the UCC instead of allowing the plaintiff to proceed under a theory of negligence.  Ritter, 912 S.W.2d at 133 & n.8.  If the existence of UCC remedies provides the justification for not allowing the plaintiff to sue in tort, the absence of UCC remedies should counsel in favor of allowing tort recovery.  Thus, the Court believes that, like the Wisconsin Supreme Court, the Tennessee Supreme Court would rely on the fact that the economic loss doctrine has its origins in the UCC to preclude application of the doctrine to suits not involving UCC remedies, specifically those concerning the provision of services.

Considering all appropriate indicia, the Court concludes that the Tennessee Supreme Court would decline to extend the economic loss doctrine to cases involving the provision of services if squarely faced with this question.  Accordingly, Swift's request to dismiss Plaintiff's negligence claim is denied.

**F. Exhaustion of Administrative Remedies**

Finally, Swift argues that Plaintiff's complaint should be dismissed in its entirety under Rule 12(b)(1) of the Federal Rules of Civil Procedure because Plaintiff has not exhausted available administrative remedies.

The requirement of exhaustion of administrative remedies is largely—though not exclusively—a creature of statute and is imposed where appropriate to fully develop issues in a contest over an agency's actions.  See Sims v. Apfel, 530 U.S. 103, 108-110 (2000); see also Coalition for Gov't Procurement v. Federal Prison Indus., Inc., 365 F.3d 435, 453-64 (6th Cir. 2004).  Exhaustion protects agency authority by allowing the agency to correct its own mistakes and promotes efficiency by allowing claims to be

developed and possibly resolved quickly and economically without resorting to litigation in the first instance.  Woodford v. Ngo, 548 U.S. 81, 88-89 (2006); Fazzini v. Northeast Ohio Correctional Ctr., 473 F.3d 228, 232 (6th Cir. 2006).

According to Swift, the revocation of Plaintiff's CDL is still subject to challenge in administrative proceedings before the responsible licensing agency in New Jersey. Seeking the reinstatement of Plaintiff's license from New Jersey officials would, Swift argues, be more efficient than the instant litigation.  Of course, Plaintiff seeks money damages from Swift, something state administrative proceedings cannot provide.  Thus, the Court rejects Swift's arguments regarding exhaustion.

**IV. CONCLUSION**

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Swift's motion to dismiss.  Plaintiff's claim under 42 U.S.C. § 1983 is **DISMISSED**.  Swift's motion is otherwise **DENIED**.  As directed above, Plaintiff shall file an amended complaint within fifteen days from the date of this order correcting the admittedly erroneous averments of his First Amended Complaint.

**IT IS SO ORDERED**, this the 17th day of March, 2010.

s/Bernice Bouie Donald
**BERNICE BOUIE DONALD**
**UNITED STATES DISTRICT JUDGE**